Filed 5/30/13  In re Ashley M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ASHLEY M. et al., Persons Coming Under the Juvenile Court Law. | B243052 (Los Angeles County Super. Ct. No. CK93422) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. SCOTT M., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Donna Levin, Juvenile Court Referee.  Affirmed.

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and John C. Savittieri, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

* * * * * *


Appellant Scott M. (Father) was involuntarily hospitalized after he had been drinking for four consecutive days and expressed suicidal thoughts. Father's girlfriend arranged for the children Ashley M. and Robert M. to go with their mother, Danielle B. (Mother) on the day Father was hospitalized. This was his third hospitalization during the past year. The juvenile court sustained a petition pursuant to Welfare and Institutions Code section 300, subdivision (b),[1] which alleged that Father's alcohol abuse and history of mental and emotional problems placed the children at risk. Father appealed, asserting that substantial evidence did not support the juvenile court's jurisdictional findings.

We affirm. The Los Angeles County Department of Children and Family Services (Department) offered sufficient evidence to show there was a substantial risk the children would suffer serious physical harm or illness from Father's inability to provide regular care for them due to his alcohol abuse and mental health issues.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Facts Preceding Detention.*

In September 2007, when Ashley was four years old, the family came to the attention of Sacramento County Child Protective Services due to allegations that Father sexually abused her. The allegations were assessed as being inconclusive. In 2008, Father was arrested for disorderly conduct and being under the influence; he had previously been arrested several times on varying charges, and had served time in prison. Father was involuntarily psychiatrically hospitalized in April and September 2011.

---

[1]    Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

2

The Department received a referral on March 29, 2012 that Father had been brought in by law enforcement and hospitalized pursuant to section 5150[2] because he was a danger to himself and others. Father was drunk and had been drinking for the past four days. He told a friend he wanted to "'Off himself.'" He likewise told law enforcement officers that he wanted to end his life and had been drinking for several days. At the time of the referral, the Department learned that Father had full custody of Ashley and Robert, and Mother had lost custody. Before he was hospitalized, Father had left the children with his girlfriend, Kim A., who contacted Mother to have her take the children. He was released after a 72-hour hold.

A Department social worker made unannounced visits to Father's home on March 30, April 7 and April 11, 2012, but did not make contact with anyone. On April 12, 2012, Father telephoned the social worker. He admitted he had recently been hospitalized and stated that he had allowed Mother to care for Ashley and Robert. He added that the children had been missing Mother and it had been difficult for him to care for them due to transportation issues. He denied that the children had been removed from Mother's custody, stating that he had sole physical custody and Mother had visitation rights.[3] He confirmed that Mother had picked up the children before he was hospitalized, and therefore they were not present when law enforcement came to pick him up. He did not admit or deny that he had a substance abuse problem and had been drinking for four

---

[2]    Section 5150 provides in relevant part: "When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Social Services as a facility for 72-hour treatment and evaluation."

[3]    Father's March 2012 declaration of custody alleged that Mother attempted suicide and was hospitalized in August 2011; Mother denied the allegations and hospital records did not support that claim.

consecutive days, stating "'I was just having some personal problems and I didn't want the kids to be around me.'" He denied that Mother or he had ever abused or neglected the children. Approximately two weeks later, Father signed a safety plan which permitted Mother to continue to care for the children during the Department's investigation. He refused to sign a release of the records concerning his hospitalization.

The social worker interviewed Mother and the children on April 14, 2012. Mother reported that Father and she had been separated for about two years, and similarly denied any neglect or abuse of the children. She was currently residing with an aunt and uncle, and confirmed that Father had custody of the children while she had visitation rights. She stated that Father had had a "'drinking problem'" and he drank almost daily, primarily beer, when he resided with her. She was aware of his past hospitalizations, but denied that he used drugs or had engaged in domestic violence. With respect to Father's recent hospitalization, Mother stated Kim A. informed her that Father was depressed, had been drinking and expressed suicidal thoughts. She picked up the children before law enforcement arrived.

Nine-year-old Ashley stated that she had everything she needed while living with Father, but she missed Mother. She reported that neither parent abused nor neglected her or Robert. She did not know what drugs and alcohol were. Four-year-old Robert appeared happy and well cared for.

The Department concluded that Ashley and Robert were at "'Very High Risk'" due to Father's mental, emotional and sobriety issues, as well as Mother's failure to obtain a custody order.

***Section 300 Petition.***

On May 9, 2012, the Department filed a section 300 petition alleging pursuant to subdivision (b) that the children were at a risk of harm from Father's history of substance abuse and current alcohol abuse (paragraph b-1) and from his history of mental and emotional problems, including his recent hospitalization to treat his psychiatric condition (paragraph b-2).

4

Father and Mother appeared at a detention hearing the same day. The juvenile court found a prima facie case for detaining the children; it removed them from Father's custody and permitted the Department to release them to Mother's custody so long as she continued to reside with her relatives. It further ordered weekly random alcohol testing for Father and allowed him monitored visitation.

### *Jurisdiction and Disposition.*

The social worker reinterviewed Father, Mother, Kim A. and the children for the Department's June 11, 2012 jurisdiction/disposition report. With respect to the petition's allegation concerning Father's substance abuse, Ashley admitted she had seen Father "drink beer . . . like one or two." Kim A. stated that Father does not usually drink. Mother stated that although Father had a drinking problem right after the two separated, she was under the impression that Father had not been drinking since he gained custody of the children. She added that he is stable and capable of caring for the children when not drinking, but that he becomes emotionally depressed when he drinks alcohol. Father admitted that he experimented with alcohol and drugs when he was a teenager and spent time in Juvenile Hall. In 1993 he was arrested for driving under the influence, and in 1995 he was arrested for unlawfully possessing a firearm and spent six years in prison. He admitted to having a problem with alcohol during that time in his life. He further stated, however, that he needed to "detox" in 2011 and he was told the only way to receive free "detox services" was to say he was a danger to himself or others.

In connection with the second allegation concerning Father's mental and emotional condition, Mother denied any knowledge of Father's prior hospitalizations and said Father told her the Department's account of his most recent hospitalization was untrue. Though he conceded that his two 2011 hospital stays were the result of his alcohol problem, Father denied ever being diagnosed with depression or being suicidal. According to him, the March 2012 hospitalization was the result of a misunderstanding. He admitted that at that time he "was having a hard time and [he] was drinking a lot," and called a friend to help him with the children. He said he began confiding in her and she must have thought he was in trouble because the police soon arrived at his home offering

5

him the choice of jail or the hospital; he chose the latter. Kim A. stated that she was unsure whether Father was suicidal in March 2012, but she did come at his request and got the children out of the house.

More generally, Mother characterized the children's custody arrangement as voluntary and reported that since their separation she and Father had been able to co-parent the children effectively. Nonetheless, in 2012 she agreed to have the family law court grant full custody of the children to Father. At the time of the jurisdiction/disposition report, neither child had received a regular medical checkup in quite some time and had not been to a dentist in over two years.

The Department opined "that both the mother and the father appear to minimize the father's mental health problems and repeatedly emphasize that each parent's individual problems have never affected or influenced the children," and that their failure to comprehend the serious nature of Father's mental/emotional and sobriety issues placed the children at risk of abuse and/or neglect. The Department recommended that the children be detained, stating: "Based on the history of mental health hospitalizations as to the father, the father's prior and current alcohol issues, the father's criminal record and the mother's prior mental health issues, the overall risk [to the future safety of the children] is 'high.'"

In a June 11, 2012 last minute information for the court, the Department reported that Father had completed four weekly random alcohol tests—all negative. At the jurisdiction/disposition hearing the same day, the juvenile court admitted the Department's reports into evidence and heard counsels' arguments. While Father's counsel sought dismissal of the petition, counsel for the Department and the children asked the juvenile court to sustain it, with the exception of the reference to Father being diagnosed with depression.

The juvenile court found that the children were persons as described in section 300, subdivision (b) and sustained the petition, striking the reference to a diagnosis of depression because the Department did not present evidence to support that allegation. The juvenile court characterized the matter as a "classic case where the father

6

doesn't want to face the seriousness of the alcohol problem." Proceeding immediately to disposition, the juvenile court declared the children dependents of the court pursuant to section 300, subdivision (b), ordered the children removed from Father's custody and placed them with Mother. It also ordered a full alcohol treatment program for Father to include random testing, a mental health psychiatric evaluation and parenting classes. Father received monitored visitation. Mother submitted to the juvenile court's jurisdiction and received family preservation and other services.

Father appealed. In January 2013, while the appeal was pending, the juvenile court terminated jurisdiction with a family law order which awarded Father and Mother joint legal custody of the children and Mother sole physical custody. We have taken judicial notice of the juvenile court's termination order. We note that "[t]he court's termination of jurisdiction does not, however, moot Father's appeal. The court's jurisdictional findings as to Father, if erroneous, could have severe and unfair consequences to Father in future family law or dependency proceedings." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 716; accord, *In re D.C.* (2011) 195 Cal.App.4th 1010, 1015.)

## DISCUSSION

Though Father appealed from both the jurisdictional and disposition orders, he challenges only the juvenile court's jurisdictional findings under section 300, subdivision (b). (See, e.g., *People v. Stanley* (1995) 10 Cal.4th 764, 793 ["'Every brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration'"].) The statute provides, in pertinent part, that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, . . . or substance abuse." (§ 300, subd. (b).) Jurisdiction under section 300, subdivision (b) is warranted by a showing "the child has suffered or there is a substantial

7

risk that the child will suffer, serious physical harm or abuse." (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261, italics omitted.)

The Department bears the burden to """"prove by a preponderance of the evidence that the child . . . comes under the juvenile court's jurisdiction."""" (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.) "On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.]" (*Ibid.*) "'The term "substantial evidence" means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. [Citation.]' [Citation.]" (*In re E.B.* (2010) 184 Cal.App.4th 568, 574–575.) In determining whether substantial evidence—contradicted or uncontradicted—supports the juvenile court's jurisdictional findings, "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

Here, substantial evidence supported the juvenile court's findings under paragraphs b-1 and b-2 of the petition.[4] In the petition's first paragraph, the Department alleged that Father "has a history of substance abuse and is a current abuser of alcohol, which renders the father incapable of providing regular care and supervision of the children." It further cited the March 2012 incident and alleged that Father's alcohol abuse placed the children's physical health and safety at risk. The juvenile court found paragraph b-1 true as pled. Highlighting the seriousness of Father's problem, the juvenile

---

[4] We address the sufficiency of the evidence under both paragraphs of the petition, even though a single basis of jurisdiction is sufficient to uphold the juvenile court's order. (E.g., *In re Dirk S.* (1993) 14 Cal.App.4th 1037, 1045; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875–876.)

court observed that even though Father had been hospitalized to "detox" on more than one occasion, he continued to drink, even with two young children under his care.

By Father's own admission, his problem with alcohol was long-standing and unresolved. Father stated that he began experimenting with alcohol at age 13. During the next 20 years, Father amassed a criminal record which included drunk driving convictions in 1993 and again sometime after 2002. He admitted that in 2011 "he did have an alcohol problem which resulted in two 'detox' stays at Henry Mayo." With respect to the March 2012 incident, Father admitted that he had been drinking for at least four consecutive days because he wanted to "'forget everything.'" Though Father noted that the children were not with him during the 2011 incidents, the March 2012 drinking incident occurred just two to three weeks after he gained full custody of the children and, by his own account, the children remained in his custody during those four days of drinking. Mother did not take custody of the children until the day Father was hospitalized.

Given these circumstances, substantial evidence supported the juvenile court's determination that the children's safety remained at risk until Father received treatment for his alcohol abuse. Even if we were to characterize the March 2012 hospitalization as a single incident of endangering conduct, it would be sufficient to support jurisdiction. As explained in *In re J.N.* (2010) 181 Cal.App.4th 1010, 1025, which involved a single incident of a parent's drinking and driving, the court explained that "[i]n evaluating risk based upon a single episode of endangering conduct, a juvenile court should consider the nature of the conduct and all surrounding circumstances," including evidence of the parent's understanding of the endangering conduct, steps taken to address the problematic conduct, and other indications that the conduct will not recur. Here, Father never acknowledged the seriousness of his alcohol abuse and instead denied that his drinking negatively affected the children. Though he did have four clean court-ordered alcohol tests before the jurisdictional hearing, there was nothing in the record suggesting that he was voluntarily participating in any type of alcohol treatment program. Nor was there

9

any indication that Mother could assist him in treating his problem, as Father told her that he had stopped drinking.

Conceding that the Department offered evidence of his recent alcohol abuse, Father argues that there was no evidence showing a nexus between his drinking and any current risk to his children. We do not agree. Section 300.2 provides that the purpose of the Welfare and Institutions Code provisions relating to dependent children is to secure protection for children being harmed or who are at risk of being harmed, and that "[t]he provision of a home environment *free from the negative effects of substance abuse* is a necessary condition for the safety, protection and physical and emotional well-being of the child." (Italics added.) Though Father has made efforts to "detox," the evidence showed that he has been unable to provide a home environment free from alcohol abuse for his children. Notwithstanding that the children remained in his care until the last day of his four days of drinking, he continued to deny that his alcohol abuse remained a current problem, stating: "In the past it was a problem (alcohol) but not now." Mother stated that Father could provide a stable environment for the children so long as he did not drink. Ashley initially told the social worker she did not know what alcohol was, but admitted in the jurisdiction/disposition report that "'I know what alcohol is . . . it's wine and I don't want to say the other thing. . . . Yeah . . . beer. I've seen my dad drink beer . . . like one or two.'" Her statements demonstrated she had some awareness of Father's alcohol consumption and a desire to conceal it.

A dependency court need not wait until the child has been seriously harmed by the parent's abuse or neglect before it assumes jurisdiction to protect the child. (E.g., *In re Heather A., supra,* 52 Cal.App.4th at p. 194.) Evidence that while the children were in Father's care he drank for a period of several consecutive days to such an extent that he required hospitalization, and thereafter failed to acknowledge that his drinking posed any problem for his children, supported the finding that his alcohol abuse created a risk of serious harm and neglect.

Similarly, substantial evidence supported the jurisdictional findings under paragraph b-2 of the petition that Father's mental and emotional condition, including

10

suicidal ideation, rendered him incapable of providing regular care and supervision of the children and placed them at substantial risk of harm. Father had been involuntarily psychiatrically hospitalized three times during the year preceding the section 300 petition. Father continued to minimize the significance of these incidents, claiming that he falsely represented he was a danger to himself or others in order to receive free services. He attributed his most recent hospitalization to "personal problems" and stated the children were with Mother while he was hospitalized because they had been missing her. Mother initially denied knowledge of Father's hospitalizations, but then acknowledged that Father had been hospitalized on more than one occasion to address his mental and emotional issues. Though Father claimed that Kim A. misunderstood his condition, she stated that preceding Father's most recent hospitalization, Father had been depressed, was drinking and said that he felt like he wanted to commit suicide. Kim A. reported to the Sheriff's Department that she called law enforcement because she feared Father "was going to hurt himself and possible [*sic*] the kids . . . ." The law enforcement officer who completed Father's application for a 72-hour detention for evaluation and treatment reported that Father told him he wanted to end his life and had been drinking for several days because he wanted to forget everything.

Substantial evidence therefore demonstrated that Father's mental health issues periodically rendered him incapable of providing adequate care for the children. Even though there was no evidence that Ashley and Robert had suffered actual physical injury as the result of Father's mental health issues, his continued efforts to minimize those issues coupled with his inability to care for the children during periods of hospitalization "pose[d] an inherent risk to their physical health and safety" (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824) and constituted substantial evidence the children were at risk of future serious physical harm or illness.

Contrary to Father's assertion, we do not find that the circumstances presented here are akin to those in *In re James R.* (2009) 176 Cal.App.4th 129. There, the court reversed a juvenile court's order under section 300, subdivision (b), based on the court's findings regarding the mother's alleged mental health problems and substance abuse.

11

(*In re James R., supra,* at p. 137.) The evidence of the mother's substance abuse and its possible relation to mental health problems was that the mother once had a negative reaction from the combination of taking eight ibuprofen tablets and drinking beer. (*Id.* at pp. 131–132.) When she realized she was having an adverse reaction, she called for help and was hospitalized. The evidence further showed she was not intentionally trying to harm herself, but needed the large dose of ibuprofen for pain relief, as she had built up a tolerance for acetaminophen. (*Id.* at p. 132.) She admitted that she had previously been hospitalized for mental health issues before her children were born and used illegal drugs approximately seven years earlier. (*Ibid.*) Both her psychiatrist and the social worker opined that the mother did not pose a risk to her young children. (*Id.* at pp. 133–134.) Moreover, the mother and father lived together, and father at all times had been able to provide adequate care for the children. (*Id.* at p. 134.) In light of this evidence, the appellate court deemed speculative any causal link between the mother's mental state and future harm to the children. (*Id.* at p. 136.)

In contrast to *In re James R.*, the evidence in the instant case showed that Father was drunk and depressed for several days while the children remained under his individual care, that he had very recently been hospitalized with thoughts of suicide and that his hospitalization rendered him incapable of caring for the children. Both Mother and Kim A. acknowledged that Father was unable to care for the children when he was drinking and depressed. More importantly, the mother in *In re James R.* recognized her problems and voluntarily initiated services before being ordered to do so. (*In re James R., supra*, 176 Cal.App.4th at p. 132.) Father never acknowledged his mental health problems, choosing instead to minimize or deny them. Thus, the possibility of recurring problems and risk to the children from Father's mental health issues was far more than speculative. (See *Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104 ["'The purpose of dependency proceedings is to prevent risk, not ignore it'"].) Substantial evidence supported the juvenile court's jurisdictional findings.

12

## DISPOSITION

The juvenile court's jurisdictional and disposition orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

          FERNS

We concur:


_____, Acting P. J.

    ASHMANN-GERST


_____, J.

    CHAVEZ

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13