[No. H036192. Sixth Dist. May 23, 2011.]

In re D.C., a Person Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND
CHILDREN'S SERVICES, Plaintiff and Respondent, v.
C.B., Defendant and Appellant.

COUNSEL

Marin Williamson, under appointment by the Court of Appeal, for Defendant and Appellant.

Miguel Marquez, County Counsel, and Susan S. Ware, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

OPINION

**PREMO, Acting P. J.**—Appellant C.B. (mother) appeals from orders of the juvenile court removing seven-year-old D.C. from mother's custody and ordering the child placed with her father. Mother contends that there was no substantial evidence to support the juvenile court's jurisdictional finding that mother subjected D.C. to an act of cruelty because there was no evidence that mother intended to harm D.C. (Welf. & Inst. Code, § 300, subd. (i).)[1] We conclude that jurisdiction under the direct-infliction prong of section 300, subdivision (i) does not require a finding that the parent actually intended to harm the child.

I. *Background*

On June 26, 2010, San Jose Police received a report of a woman trying to drown a child in the fountain at the Rose Garden Park in San Jose. When police arrived they found D.C. near the fountain; her clothing was wet. Mother was on the grass nearby. D.C., who has cerebral palsy and suffers from right-side weakness and cognitive deficits, told the responding officer that mother had put her over the fence around the fountain, then climbed the fence herself and held D.C. under the water. D.C. said mother did not give her time to hold her breath. A woman in a blue dress "rescued" her.

[1] All unspecified section references are to the Welfare and Institutions Code.

The rescuer reported that she saw mother walk up to the fence and throw D.C. over it so that the child landed in the water. Mother then climbed over the fence and said, "I am sorry, I have to do this." D.C. was screaming that she was scared but mother pulled her onto her back and held her under the water for about 10 seconds. Mother then pushed the child under the water a second time while D.C. struggled against her. The witness got into the pool and pulled the child from the water. Mother ran away screaming.

Mother told the police that she had been trying to cleanse D.C. both "physically and spiritually." She said that D.C. was "terrified" of the water and mother was trying to help her get over her fear. Mother "prayed for God to save her child."

Mother has a history of mental illness and substance abuse. In 1996, the Santa Clara County Department of Family and Children's Services (Department) had received a referral concerning mother's threat to kill herself and D.C.'s half sibling. D.C. was born with traces of marijuana and barbiturates in her blood. Mother admitted she had been using methamphetamine "daily" since March 2010 in order to help D.C. with her homework. During interviews with the social worker following the fountain incident, mother explained that D.C. had been acting out and "having a fit." Mother "wanted God to get the negativity out of [D.C.] and any yucky stuff," which is why she put the child in the pool.

D.C. was taken into protective custody. The Department filed a petition alleging that D.C. came within the provisions of section 300, subdivisions (b) (failure to protect), (g) (no provision for support) and (i) (acts of cruelty). The Department did not recommend services for mother and did not recommend visitation while mother was in custody on criminal charges relating to the fountain incident. D.C. was eventually placed with D.C.'s father. She has had several nightmares and once at school became very upset during an assembly when the lights were turned off and a recording of the sound of gushing water was played.

Mother agreed that jurisdiction was appropriate but challenged the Department's allegation under section 300, subdivision (i), that D.C. had been "subjected to an act or acts of cruelty by the parent." Mother argued that she had no malicious intent and, therefore, that it cannot be true that she subjected D.C. to an act of cruelty. At the jurisdictional and dispositional hearing, a witness to the incident testified that he was present when mother put D.C. in the fountain. The witness saw the child crying and mother putting her under the water for what he estimated was about five seconds. He was relieved when mother pulled the child up because it looked like she was just baptizing her. But then she put D.C. under again for a longer time. It "seemed

like it was too long" so that the witness thought the woman was trying to drown the child. He heard the woman say, "Please forgive me, I have to do this." The witness's adult daughter intervened and pulled the child to safety. The witness testified that it seemed as if mother was hearing voices. As she walked away she looked up and said, "Did I do good?"

One of the officers responding to the call also testified at the hearing. He stated that D.C. told him about being rescued. He asked her what "rescue" meant and D.C. replied that it meant "helping you when you are in trouble." D.C. also told him that she did not feel safe with mother.

The juvenile court ruled as follows: "There are a few facts that help push me towards sustaining the [section 300, subdivision (i) allegation] and I will recite those as follows: In spite of the mother's mental state at the time of this event, it is simply so that she in the past has threatened to kill this child and herself. She knew her daughter was terrified of the water. She also fled the scene which indicates to me knowledge of a bad act. I agree that this was an entirely willful act and it is one that shocks the conscience of a witness, of a bystander. And, in fact, that shock of conscience, in my opinion, is exactly why this act is cruel. It is not something that anybody on the planet would think otherwise. It's inappropriate, it's an act that surpasses any sort of social norm." The Department withdrew the section 300, subdivision (g) allegation and the court sustained the petition as amended, finding that the child "does come within [section] 300 [subdivisions] (b) and (i)." This appeal followed. In it mother challenges only the juvenile court's finding that D.C. was subjected to acts of cruelty within the meaning of section 300, subdivision (i).

II. *Discussion*

■ The juvenile court may take jurisdiction over a child in a dependency case only if the court finds the child to be a person described by one or more of the section 300 subdivisions. The Department has the burden to prove the jurisdictional facts by a preponderance of the evidence. (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1082 [59 Cal.Rptr.2d 575]; *In re Shelley J.* (1998) 68 Cal.App.4th 322, 329 [79 Cal.Rptr.2d 922].)

■ In the present case, mother challenges the juvenile court's finding under section 300, subdivision (i), which provides that the juvenile court may adjudge a person to be a dependent child of the court where "The child has been subjected to an act or acts of cruelty by the parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from an act or acts of cruelty when the parent or guardian knew or reasonably should have known that the child was in danger of being subjected to an act or acts of cruelty." Thus, jurisdiction under section

300, subdivision (i) is appropriate in two situations: The first is where the parent, guardian, or member of the household has directly subjected the child to an act or acts of cruelty. The second is where the parent or guardian has failed to protect the child from acts of cruelty by others. We are concerned with only the first situation. Mother maintains that in order to prove the allegation that she directly subjected D.C. to an act of cruelty the Department had to prove that mother intended to hurt the child. According to mother, the evidence does not support such a finding.

The Department argues initially that the appeal is moot because mother does not challenge the juvenile court's alternative basis for taking jurisdiction so that even if the section 300, subdivision (i) finding were error, the result would be the same. Mother responds that the appeal is not moot because the ruling could be prejudicial to her if she is involved in future child dependency proceedings. We agree that the ruling, if it is erroneous, has the potential mother cites and, therefore, shall consider the merits of her appeal. (Cf. *In re C.C.* (2009) 172 Cal.App.4th 1481 [92 Cal.Rptr.3d 168].)

■ The substantive question is whether section 300, subdivision (i) requires the petitioner to prove that the parent intended to harm the child where it is alleged that the child was subjected to an act of cruelty by the parent. The question is one of statutory interpretation calling for our independent review. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [Cal.Rptr.2d 531, 828 P.2d 672].) Our fundamental task is to ascertain the intent of the lawmakers. We begin with the statutory language, giving the words their usual and ordinary meaning. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196]; *In re Angelique C.* (2003) 113 Cal.App.4th 509, 517 [6 Cal.Rptr.3d 395].) When necessary, we may be aided by the rules of statutory construction, which require that a specific provision be construed with reference to the entire statutory scheme to advance the public policy underlying the law. (*Bowland v. Municipal Court* (1976) 18 Cal.3d 479, 487–489 [134 Cal.Rptr. 630, 556 P.2d 1081].)

Beginning with the plain language of the subdivision we note that the direct-infliction clause makes no mention of the parent's state of mind. The indirect-infliction clause—where the child has been subjected to acts of cruelty by others—requires that the petitioner show that the parent "knew or reasonably should have known that the child was in danger." But the direct-infliction clause refers only to the act; it makes no reference to a further intent to achieve a particular result. This makes perfect sense given the purpose of dependency proceedings. The overarching goal of dependency proceedings is to safeguard the welfare of the children involved. (*In re Josiah Z.* (2005) 36 Cal.4th 664, 673 [31 Cal.Rptr.3d 472, 115 P.3d 1133]; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1228 [91 Cal.Rptr.3d 140, 203 P.3d

454].) In dependency proceedings, it would be illogical to require proof that a parent who directly subjected the child to a cruel act did so with the specific intent to harm. Rather, it is enough that the parent intended to perform the act.

Although the direct-infliction clause of section 300, subdivision (i) makes no mention of the parent's state of mind, it does require proof that the child was subjected to an act or acts of *cruelty*, which, mother maintains, implies that the parent did the act with the intent to harm. But the usual and ordinary meaning of the phrase does not necessarily incorporate the intent mother ascribes to it. Webster's defines the noun "cruelty," as "inhuman treatment" as in "the cruelty of racial discrimination." (Webster's 3d New Internat. Dict. (1993) p. 546, col. 1.) "Cruel" can mean "disposed to inflict pain esp[ecially] in a wanton, insensate, or vindictive manner." It can also mean "severe, distressing : extremely painful." (*Ibid.*, capitalization & boldface omitted.) Another source defines "cruelty" as "cruel behaviour or attitudes" and, as used in law, as "behaviour which causes physical or mental harm to another, whether intentionally or not." (Concise Oxford English Dict. (11th ed. 2004) Oxford University Press, p. 344, col. 2.) The same source defines the core meaning of "cruel" as "disregarding or taking pleasure in the pain or suffering of others" and its related subsense as "causing pain or suffering." (*Ibid.*) Black's Law Dictionary defines "cruelty" as "The intentional and malicious infliction of physical or mental suffering upon living creatures, particularly human beings; or, as applied to the latter, the wanton, malicious, and unnecessary infliction of pain upon the body, or the feelings and emotions; abusive treatment; inhumanity; outrage." (Black's Law Dict. (6th ed. 1990) p. 377, col. 1.)

As shown by the foregoing general references, "cruelty" has different meanings in different contexts. We can find no published case parsing the phrase, "acts of cruelty," although several describe facts that were alleged in support of a section 300, subdivision (i) allegation. In one, the child's father repeatedly pinched the two-year-old on the stomach and arms, would not allow the mother to cover the child when out of doors in the cold and wind, poured a packet of hot sauce into the child's mouth, and held him under a cold shower to stop his crying. (*In re Benjamin D.* (1991) 227 Cal.App.3d 1464, 1466–1467 [278 Cal.Rptr. 468].) The appellate court noted, "Undoubtedly, these pinchings, particularly on the abdomen, entailed real physical pain on a child not yet three years old, especially in the light of the other evidence pointing to [the father's] cavalier indifference toward the infliction of physical pain on Benjamin. Such facts establish Benjamin was, indeed, subject to an act or acts of cruelty by [the father]." (*Id.* at p. 1472.) In *Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 746 [50 Cal.Rptr.2d 858], acts of cruelty included the mother's confining the child to his room or a dark closet for prolonged periods of time, restraining the child by tying his ankles and

wrists together, putting a sock in his mouth to stop him from screaming, and poking the boy with a screwdriver.

These cases illustrate "acts of cruelty" as that phrase is commonly understood within the dependency context. They are intentional acts that directly and needlessly inflict extreme pain or distress. They might be described, as one source suggests, as acts that produce a shock of conscience. (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2011) § 2.84[10], p. 2-226.)

In sum, we think jurisdiction is appropriate under the direct-infliction prong of section 300, subdivision (i) where a parent intends to commit the act notwithstanding the absence of evidence that the parent actually intended to harm the child. Whether the acts are acts of cruelty is a separate factual determination that the juvenile court makes based upon the common meaning of the phrase and the totality of the child's circumstances. (*In re Chantal S.* (1996) 13 Cal.4th 196, 201 [51 Cal.Rptr.2d 866, 913 P.2d 1075].)

Our conclusion is reinforced by analogy to the holding of our Supreme Court in *People v. Sargent* (1999) 19 Cal.4th 1206 [81 Cal.Rptr.2d 835, 970 P.2d 409] (*Sargent*). *Sargent* involved Penal Code section 273a, subdivision (a), which makes it a crime to cause or permit a child to suffer "unjustifiable physical pain or mental suffering."[2] *Sargent* rejected the contention that proof of criminal negligence was required for conviction under the direct-infliction prong of that statute. *Sargent* held that the actus reus of the crime "is infliction of unjustifiable physical pain or mental suffering on a child." (*Sargent, supra*, at p. 1222.) The mens rea is the "general criminal intent to commit the proscribed act." (*Id.* at p. 1224.) In order to prove the crime as a felony, the prosecution had to show that the act occurred "under circumstances or conditions likely to produce great bodily harm or death." (Pen. Code, § 273a, subd. (a).) But this element is a factual question that is based upon matters extrinsic to the actor's intent. (*Sargent, supra*, at pp. 1222–1223.) As to intent, "no further mental state beyond willing commission of the act proscribed by law" is necessary. (*Id.* at p. 1215.)

If the general intent to commit the act is sufficient to convict the person of direct infliction of child abuse, it is surely sufficient for the juvenile court to take jurisdiction to protect the child. Indeed, it is the nature of the act

---

[2] Penal Code section 273a, subdivision (a) provides, in pertinent part, "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered" is guilty of a felony.

and its effect upon the child that matter most. Thus, in order to take jurisdiction under section 300, subdivision (i), the juvenile court must find that the parent intended to commit the act. Whether the act is an "act of cruelty" is a factual question that does not require a finding that the parent specifically intended to cause harm.

Mother correctly maintains that many of the section 300 bases for jurisdiction may be understood as referring to acts of cruelty. Section 300, subdivision (a) requires a finding that the child has suffered nonaccidental, serious physical harm by the parent. Section 300, subdivision (c) is invoked when the parent's conduct causes a child to suffer "serious emotional damage" as defined. Section 300, subdivision (d) provides for jurisdiction where the child has been sexually abused by the parent. And under section 300, subdivision (e), jurisdiction may be taken over a young child whose parent inflicts "severe physical abuse." Mother argues that given the substance of these subdivisions, section 300, subdivision (i) would be surplusage unless we interpret it as requiring a finding of malice on the part of the parent who is alleged to have inflicted the harm. But even though facts to support a jurisdictional finding under the foregoing subdivisions could be deemed acts of cruelty, not all acts of cruelty fall within these subdivisions. The repeated painful pinching of a young child and pouring hot sauce in his mouth or locking the child in a dark closet for extended periods are acts that may not fit the precise requirements of subdivision (a), (c), (d), or (e), but they do warrant judicial inquiry into whether the child is safe in the care of a parent who does such things, regardless of the parent's intent.

■ Since we have rejected mother's contention that the direct-infliction prong of section 300, subdivision (i) requires proof of the parent's intent to harm, we need not reach her argument that the evidence is insufficient to prove that intent. To the extent mother maintains that the evidence does not support a finding that her act was an act of cruelty, we reject it. Under the substantial evidence standard of review, we uphold the juvenile court's jurisdictional finding unless there is no substantial evidence to support it. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022 [104 Cal.Rptr.3d 478].) Here there was evidence that D.C. was screaming in fear, mother knew she was terrified of the water, and she threw the child into the water and held her under for long enough that onlookers feared she was trying to drown the child. This is evidence that the act was an act of cruelty. Mother is correct that there is no evidence to support the juvenile court's finding that mother had a history of threatening to kill D.C. The only evidence pertaining to such a threat is that which appeared in the 1996 report involving D.C.'s half sibling. Nevertheless, the balance of the evidence supports the finding that D.C. was subjected to an act of cruelty by mother.

III. *Disposition*

The jurisdictional order of the dependency court is affirmed.

Elia, J., and Lucas, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied August 24, 2011, S194424.

---

*Judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.