Filed 7/9/13  In re N.L. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.L. et al., Persons Coming Under the Juvenile Court Law. | H039116 (Santa Clara County Super. Ct. Nos. JD21215, JD21216) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. C.L., Defendant and Appellant. | |

C.L. (Mother), appeals from the dispositional order in this dependency case.  The juvenile court declared the children (N.L. and X.L.) dependents of the court (Welf. & Inst. Code, § 300)[1] and ordered them placed in a foster home.

Mother contends the juvenile court erred by failing to offer her reasonable reunification services, including visitation, and by placing the children in a foster home outside the county without following proper procedures.  Mother also contends one of the allegations of the section 300 petition concerning X.L. was not supported by substantial

---

[1] Unspecified section references are to the Welfare and Institutions Code.

evidence.  For the reasons explained below, we will affirm the juvenile court's dispositional order.

## BACKGROUND

### A.    *Section 300 Petitions and Initial Reports*

On May 11, 2012, the Santa Clara County Department of Family and Children's Services (Department) filed petitions alleging that the children fell within the dependency jurisdiction of the juvenile court under section 300, subdivision (b) [failure to protect] and section 300, subdivision (c) [serious emotional damage].  At the time, N.L. was almost three years old and X.L. was about one and a half years old.

The Department filed an initial hearing report on May 14, 2012, a first amended section 300 petition on June 1, 2012, and a jurisdiction report on June 21, 2012.  The petitions and reports alleged the following facts.

### 1.    **Mother's Criminal and Psychiatric History**

Mother was diagnosed with schizophrenia at age 16.  In 1995, Mother's two-year-old child, N.M., was removed from her custody and placed with his father due to her mental health problems and her inability to provide appropriate and adequate care for him.

In 2003, Mother was convicted of battery on emergency personnel.  (Pen. Code, § 243, subd. (c)(1).)  In 2005, she violated the conditions of her parole by committing assault with a deadly weapon, driving without a license, reckless driving with injury, and assault on an emergency room staff member.

Mother was committed to Patton State Psychiatric Hospital (Patton) on July 9, 2010 after she drove on the wrong side of the road and tried to kill herself and N.L., who was in the car.  She was diagnosed with schizoaffective bipolar disorder NOS, alcohol dependence, and cocaine dependence.  Mother was pregnant with X.L. while at Patton, and she refused to take her antipsychotic medication because of her pregnancy.  As a

result, she was paranoid and delusional. Also while at Patton, Mother attacked another patient. Mother was released from Patton on November 2, 2011, to a Conditional Release Program (CONREP) in Fresno.

### 2. Father's Criminal and Psychiatric History

The children's father, D.L. (Father), had a criminal history that included providing false identification, robbery, burglary, grand theft, willful discharge of a firearm in a negligent manner, possession of a controlled substance, and battery by a prisoner. In 2000, following the battery by a prisoner, Father was found not guilty by reason of insanity and sent to Atascadero State Psychiatric Hospital (Atascadero).

N.L. lived with Father after Mother's commitment to Patton in July 2010, until Father himself was arrested and returned to Atascadero in December of 2010. At that point, N.L. went to live with Mother's sister, S.R., who had been caring for X.L. since his birth. S.R. soon became the children's legal guardian.

### 3. Children's Placement and Behavioral History

On April 20, 2011, N.L. was diagnosed with an adjustment disorder, mixed receptive-expressive language disorder, and delayed development in several skill areas. He was also diagnosed with being deaf in one ear. He exhibited "overly aggressive behaviors" and received services from several providers.

In March of 2012, someone reported that the children were being abused while in the care of S.R., the legal guardian. S.R. agreed to participate in Voluntary Family Maintenance services "to address the children's special emotional and behavioral needs." However, S.R. subsequently decided to terminate the guardianship "due to alleged threats and harassment from maternal relatives." As a result, on May 9, 2012, the children were placed in protective custody. On May 25, 2012, the Department filed a motion to terminate the legal guardianship.

3

### B. *Jurisdictional Hearing and Transfer*

The Department's jurisdiction report, dated June 5, 2012, indicated the children were in a confidential Emergency Satellite Home placement. The Department requested that the court find the allegations of the section 300 petition true, terminate the legal guardianship, and transfer the matter to Fresno County for disposition, since that was the location of Mother's CONREP facility. Father was still in custody at Atascadero at the time.

At the time of the jurisdictional hearing on June 21, 2012, the children were still living in a confidential Emergency Satellite Home placement. Mother and Father were both represented by counsel, and Father was personally present. The court found the allegations of the section 300 petition true – i.e., that both children fell within the dependency jurisdiction of the juvenile court under section 300, subdivision (b) [failure to protect] and section 300, subdivision (c) [serious emotional damage]. The court terminated the legal guardianship, and it ordered the children transported to Fresno County within seven court days.

The Fresno County juvenile court acknowledged receipt of the children's records on July 2, 2012. The transfer-in hearing was continued several times. The minute order from a hearing on July 26, 2012 noted that Mother was present and that she would be entering a residential treatment program in San Joaquin County. During an ex parte hearing on August 20, 2012, the Fresno County juvenile court accepted the transfer, but the next day, it transferred the matter back to Santa Clara County.

In a report dated September 19, 2012, the Department noted that the children were "in an out of county placement in Bakersfield." The report indicated that Mother was residing either at the CONREP facility in Fresno or at a residential treatment program in San Joaquin County. The report indicated that Father was in a conditional release program in San Diego County.

4

On September 19, 2012, the juvenile court held a transfer-in hearing. Neither Mother nor Father were personally present, but both were represented by counsel. The court continued the dispositional hearing to October 12, 2012.

In an addendum report dated October 12, 2012, the Department notified the court that Mother had been sent to Napa State Hospital. Mother had requested to see the children. The social worker requested a continuance to determine whether a visit was possible in light of Mother's mental health issues and the fact she remained at Napa State Hospital. Father was still living in San Diego County.

The Department also reported on the children's placement, stating that they were "making excellent progress in the care of the foster parents." The report described how N.L.'s speech had improved so that he could communicate better and how X.L. had "a lot fewer tantrums."

### C. Pre-Disposition Hearings

At the October 12, 2012 hearing, Mother and Father were not personally present but both were represented by counsel. The Department reiterated its requests that the dispositional hearing be continued so the social worker could try to set up a visit between Mother and the children at Napa State Hospital.

The children's attorney was "adamantly opposed to visitation," noting the children were "extremely young" and had "special needs." She further noted that X.L. had never been in Mother's care, and that neither child had any relationship with Mother and might not "even know she exists." The children's attorney referred to Mother's psychiatric and criminal history, emphasizing that it included violent behavior. She stated, "this isn't family reunification."

The Department noted that it was responsible for determining whether any services were appropriate. The juvenile court agreed that the social worker should perform further investigation and stated that it did not have "enough information to feel that the visits would currently be safe." The court indicated it was interested in whether

5

the foster parents believed that the children could "absorb such a visit," noting that it would be "a long trip there and back." The court also expressed reservations about whether Napa State Hospital offered any way to supervise visitation at its facilities.

Mother's counsel noted that in order to deny visitation at disposition, the court would need to "make a detriment finding." The court agreed and reiterated that it did not have "enough information right now to make any of those assessments." However, it again expressed doubt about whether visitation would be appropriate in light of Mother's mental health issues and the children's fragility.

The court continued the dispositional hearing to November 2, 2012. On that date, the children's attorney requested a continuance. She had received a "recommendation for family reunification for both parents" and had "some concerns," so she wanted time to look into grounds for a bypass of reunification services. The dispositional hearing was continued again, to November 14, 2012.

On November 14, 2012, neither Mother nor Father appeared, but both were represented by counsel. Father had moved to a board and care in San Francisco. The juvenile court noted that the issue of visitation was contested. The court also noted it still did not know what rules Napa State Hospital had regarding visitation. The court put the matter over until December 12, 2012 "for more information and trial setting and [early resolution conference]."

### D.    *Disposition Reports*

The Department submitted a disposition report dated November 2, 2012, recommending that the juvenile court order psychological evaluations of both parents to determine whether reunification services should be bypassed. The Department recommended that Mother have supervised visitation at least once a month, but it noted that if visitation was ordered for Mother at Napa State Hospital, it "would need to be arranged in a secure location." According to the disposition report, the social worker had

6

interviewed Mother at Napa State Hospital and had referred her to Parent Orientation and Parent Education. Mother had indicated that she "would like to do an open adoption."

In an addendum report dated December 12, 2012, the social worker changed her recommendation, now stating that "it would be detrimental" for the children to visit Mother. The social worker based her opinion on "the extremely long trip from Bakersfield," "the children's level of anxiety," and the fact that "the children have not asked for their birth parents." However, the social worker noted that it was "possible" to have visitation at Napa State Hospital, and she described the process for setting up a visit at the facility.[2]

The social worker noted that the children's foster parents had been working with a therapist who had directed them to structure routines for the children. Maintaining a "regular, familiar daily schedule and routine" had helped the foster parents earn the children's trust and provide the children with a sense of security. This had helped the children "heal from the lack of permanence" in their lives. The social worker believed that visits with Mother and Father "would und[o] all the work that the foster parents have done." In addition, the social worker noted that the trip to Napa would take at least five hours and that the children had previously begun to "cry incessantly" after a car ride of two and a half hours.

The social worker stated that even telephone contact with Mother and Father would be confusing for the children. The children had "bonded with the foster mother and father and believe that this is their family and home."

A letter from the foster parents was attached to the addendum report. The foster parents described the children's initial anxiety about whether they were going to stay at the foster home or be moved again. N.L. would wake up six to eight times each night,

---

[2] "The process of setting up a visit is to call the Visiting Center and request whatever day and time that works best and they will reserve the room. You will not need a clearance, as the visiting center is outside the secure treatment area."

"coming into our room just to make sure we were there." He was also "rarely sleeping during naptime, likely due to his high levels of anxiety and constant hyper vigilance." The foster parents had adjusted N.L.'s sleeping arrangements and he was finally getting uninterrupted sleep. However, on a daily basis, N.L. still asked the foster parents "if this is his home," and every time they left the house he asked "if he is coming back."

The foster parents explained that they were keeping "a very structured and routine schedule, which both boys seem to find comforting and calming." Changes to the routine often caused N.L. anxiety and poor behavior. X.L. did not have anxiety to the same degree, but he was "very cautious of new people." Both children exhibited separation anxiety when the foster parents were gone.

The foster parents reported that neither of the boys asked or talked about their birth parents. The foster parents believed that the boys needed "a tie to their birth family so that in time they can learn more about themselves," but did not believe that visits with Mother and Father would be in the children's best interests at that time. The foster parents opined that "exposure to family members in new settings would cause them a lot of anxiety and damage the trust we have been able to help them build."

### E. Dispositional Hearing

On December 12, 2012, mother appeared in court for the dispositional hearing.

Mother told the juvenile court that she was "in disagreement" with the Department's recommendation that she undergo psychological evaluations and have no contact with the children. Mother requested the court order reunification services including "parenting classes and other such services that . . . would genuinely help her to reunify with her children." When the court asked Mother to be specific about what she was contesting, Mother responded, "it's the case plan and the visits." After a further discussion, Mother agreed to the psychological evaluations and agreed the court could reserve the issue of "a more complete case plan."

Mother requested the juvenile court order visitation while the psychological evaluations were pending. The court denied Mother's request, saying, "I can't do that without a hearing. . . . I mean, right now there is evidence regarding that being a detriment to the children at this time." The court offered Mother the opportunity to have "a hearing on visitation prior to the evaluations," but reiterated that it did not believe the evidence supported a visitation order.

Mother's attorney responded that Mother "understands where the Court's coming from and would just ask that there could be some correspondence with letters and photographs if they're appropriate." After a brief further discussion, Mother's attorney reiterated that Mother was agreeing to "going forward today with disposition" and that Mother wanted "the opportunity for correspondence while participating in the evaluations to look at what services might benefit [her] as well as what visitation should look like."

The juvenile court adjudged the children wards of the court, finding that removal was necessary and that the children's current placement was appropriate. The court ordered "services from the family reunification program" and "adopt[ed] the limited case plan" that the Department had recommended – that is, the psychological evaluations. The court reserved jurisdiction over the case plans and visitation until after it received the psychological evaluations. The court ordered that the social worker facilitate correspondence between the parents and the children through the children's therapist.

The juvenile court set an interim review date of February 11, 2013 for receipt of the psychological evaluations, and it set a six-month review hearing for June 12, 2013.[3]

---

[3] We granted the Department's request for judicial notice of a minute order dated June 17, 2013. The minute order indicates that after the psychological evaluations were submitted, the Department filed a section 388 petition. The juvenile court found "clear and convincing evidence" that the parents' mental health issues rendered them incapable of receiving reunification services. (See § 361.5, subd. (b)(2).) The court denied reunification services, reserved the issue of visitation, and set the matter for a permanency planning hearing. (See § 366.26.)

## DISCUSSION

### A.    *Reunification Services*

Mother contends the juvenile court failed to offer her reasonable reunification services in the case plan it adopted at the dispositional hearing. She claims she was entitled to receive reunification services in addition to the psychological evaluations, including visitation.

### 1.    General Principles

In the dispositional order, the juvenile court is generally required to provide reunification services if the child is removed from a parent's or guardian's custody. (Cal. Rules of Court, rule 5.695(h)(1);[4] § 361.5, subd. (a).) However, reunification services may be bypassed if the court finds, by clear and convincing evidence, that the case involves one or more of the circumstances listed in section 361.5, subdivision (b). (See rule 5.695(h)(6).)

One of the grounds for bypassing reunification services is "[t]hat the parent or guardian is suffering from a mental disability . . . that renders him or her incapable of utilizing those services." (§ 361.5, subd. (b)(2).) Before the court can bypass reunification services on this ground, there must be "competent evidence from mental health professionals establish[ing] that, even with the provision of services, the parent is unlikely to be capable of adequately caring for the child within the time limits specified in subdivision (a)." (§ 361.5, subd. (c).)

Reasonable reunification services are required even for parents who are incarcerated or institutionalized, "unless the court determines, by clear and convincing evidence, [that] those services would be detrimental to the child." (§ 361.5, subd. (e)(1); see also rule 5.695(h)(13).) However, when a parent is incarcerated or institutionalized, reunification services may only include visitation where "appropriate" (§ 361.5,

---

[4] All further rule references are to the California Rules of Court.

10

subd. (e)(1)), and visitation should be denied if it would be detrimental to the child.  (See *In re Dylan T.* (1998) 65 Cal.App.4th 765, 775 (*Dylan T.*).)

The reasonableness of reunification services is "judged according to the circumstances" of the case.  (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362 (*Ronell A.*).)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*).)

On appeal, we apply the substantial evidence test to the question of whether reunification services were reasonable.  (*Ronell A., supra,* 44 Cal.App.4th at pp. 1362-1363.)  We also apply the substantial evidence test to the question of whether visitation would be detrimental to the child.  (See *Dylan T., supra,* 65 Cal.App.4th at p. 775.)  Thus, in addressing those questions, we "view the evidence in a light most favorable to the respondent" and "indulge in all legitimate and reasonable inferences to uphold the verdict."  (*Misako R.*, *supra*, 2 Cal.App.4th at p. 545.)

### 2. Failure to Order Additional Services

Mother contends that she should have been offered specific reunification services in addition to the psychological evaluations.  She argues that she was entitled to services that would actually aid her in reunifying with the children during the interim.

Respondent contends that Mother forfeited this claim because she consented to the juvenile court's decision to order the psychological evaluations and reserve jurisdiction over the rest of the case plan.  We disagree.  At the dispositional hearing, Mother contested the Department's recommendations, stating she was "in disagreement," and she requested reunification services, including "parenting classes and other such services that . . . would genuinely help her to reunify with her children."  Thus, she did not forfeit this issue for appeal.  (See *In re Javier G.* (2006) 137 Cal.App.4th 453, 464 (*Javier G.*).)

In addressing the merits of this issue, both parties discuss this court's decision in *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 881 (*Sheila S.*).  In *Sheila S.,* the

11

juvenile court took jurisdiction over three children after finding that the mother placed the children at risk by allowing them to have unsupervised contact with their grandfather, a registered sex offender who had sexually abused the mother when she was a child. (*Id.* at p. 875.) The juvenile court ordered psychological evaluations of the mother, but the evaluations were not completed by the time of the disposition hearing. Thus, at the dispositional hearing, "[t]he juvenile court ordered out-of-home placement of the children and reunification services for mother," then set a review hearing for receipt of the psychological evaluations. (*Id.* at p. 876.) The Department subsequently filed a section 388 petition to modify the disposition, and the court terminated reunification services based on the results of the psychological evaluations. On appeal, the question was whether "a section 388 petition is an appropriate vehicle for modifying a dispositional order and ordering a bypass of reunification services." (*Id.* at p. 879.)

Mother claims that the juvenile court should have ordered reunification services pending the results of the psychological evaluations, as the court ordered in *Sheila S.* However, *Sheila S.* did not consider whether reunification services were required pending the results of psychological evaluations. In fact, as the opinion only makes a passing reference to "reunification services for mother," it is unclear what kind of reunification services were ordered in that case. (*Sheila S., supra,* 84 Cal.App.4th at p. 876.) Thus, *Sheila S.* does not support Mother's claim that she was entitled to receive any particular reunification services while the psychological evaluations were pending.

Under the circumstances of this case, the juvenile court's decision to order psychological evaluations and reserve jurisdiction over the rest of the case plan was reasonable. (See *Misako R., supra,* 2 Cal.App.4th at p. 547.) The juvenile court could not determine whether Mother could even utilize reunification services until it received the psychological evaluations. (§ 361.5, subd. (c); see *Linda B. v. Superior Court* (2001) 92 Cal.App.4th 150, 152-153.) In light of Mother's mental illness and the evidence of how it had impacted her ability to provide adequate and appropriate care for the children,

12

the juvenile court reasonably reserved jurisdiction over the question of services until after receiving the psychological evaluations.

Moreover, on this record, the juvenile court could have denied reunification services altogether on the basis that Mother was institutionalized and reunification services would be "detrimental to the child" within the meaning of section 361.5, subdivision (e)(1). The children were both very young and had no current bond with Mother. (See § 361.5, subd. (e)(1) [detriment factors include "the age of the child" and "the degree of parent-child bonding"].) Mother was institutionalized for an indeterminate period of time and had a lengthy history of mental illness and violence, which presented a risk to the children's safety. (See *ibid.* [detriment factors also include "the length of the sentence" and "the nature of the crime or illness"].) Under the circumstances, substantial evidence would have supported an order denying reunification services to Mother. (See, e.g., *Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 119 [reunification services would be detrimental to children because of anticipated length of the father's incarceration, "his minimal contact with the children before he was incarcerated," and the risk he posed to their safety because of his history of abusive acts].) However, rather than deny reunification services on this basis, the juvenile court "adopt[ed] the limited case plan" that the Department had recommended – that is, the psychological evaluations – and it reserved the question of whether to order additional services until after it received the psychological evaluations. This procedure ensured that Mother could be offered reunification services at a later date.

### 3. Failure to Order Visitation

Mother contends the juvenile court erred by failing to order visitation pending the results of the psychological evaluations.

Respondent contends that Mother forfeited this claim for appeal. We disagree. At the dispositional hearing, Mother specifically requested the juvenile court order visitation pending the psychological evaluations. The court denied her request, stating that it could

13

not order visitation without a hearing because there was evidence of "that being a detriment to the children at this time." Because Mother contested the recommendation of no visitation, she did not forfeit the issue for appeal. (See *Javier G., supra,* 137 Cal.App.4th at p. 464.)

Although Mother did not forfeit her challenge to the order of no visitation, substantial evidence supports the juvenile court's finding that visitation would be "a detriment to the children at this time." (See *Dylan T., supra,* 65 Cal.App.4th at p. 774; see § 361.5, subd. (e)(1)(A).)

A finding that visitation would be detrimental may be based in part on the distance between the parent's institution and the child's placement. (*In re Jonathan M.* (1997) 53 Cal.App.4th 1234, 1238 ["distance is a factor to be considered in the analysis"], disapproved on other grounds by *In re Zeth S.* (2003) 31 Cal.4th 396, 413-414.) An order failing to provide visitation, but allowing contact through telephone calls and letters "may well be appropriate where the parent is incarcerated some distance from where the minor resides." (*In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1407, fn. 8 (*Brittany S.*); see also *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1791-1792 [denial of visitation could have been justified by the fact that mother was institutionalized in a hospital that was "geographically remote from the children's placement"]; *Ronell A., supra,* 44 Cal.App.4th at p. 1364 [failure to provide for visitation was reasonable where mother was incarcerated in a prison "a full day's drive distant" from the children's placement].)

In this case, the children's placement in Bakersfield was a substantial distance from Napa, where Mother was institutionalized at the time of the dispositional hearing. According to the social worker, the trip would take at least five hours each way. The children were young and did not respond well to long car rides. A long trip would also have been disruptive to the children's routine, which was important in helping them overcome the anxiety and behavioral issues they exhibited at the time of their placement. Thus, the distance between Mother's institution in Napa and the children's placement in

14

Bakersfield supports the juvenile court's finding that visitation would be detrimental to the children. (See *Brittany S., supra,* 17 Cal.App.4th at p. 1407, fn. 8.)

An order denying visitation to an incarcerated or institutionalized parent can also be based on evidence that visitation would be stressful on the child and thus "harmful to the child's emotional well-being." (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008 (*Christopher H.*); see also *In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 838-839.) Here, the social worker opined that visitation would be detrimental for the children because of their "level of anxiety." The letter from the foster parents established that the children had extreme anxiety about whether they would be moved again, and the foster parents believed that "exposure to family members in new settings would cause them a lot of anxiety." This evidence supported a finding that visitation would be stressful on the children and thus "harmful to the child[ren]'s emotional well-being." (*Christopher H., supra,* at p. 1008.)

Visitation may also be detrimental when the parent is incarcerated or institutionalized for the very behavior that led to the dependency proceedings. (*Ronell A., supra,* 44 Cal.App.4th at pp. 1357, 1364 [mother in prison for committing felony injury to a child].) Here, Mother was institutionalized, at least in part, for behavior that led to the dependency proceedings. The section 300 petition alleged that Mother's mental illness and non-compliance with her medication rendered her incapable of providing safe and appropriate care for the children. The petition also alleged that jurisdiction was necessary because Mother had been sent to a state hospital after an episode where she tried to kill herself and N.L., while she was pregnant with X.L. The fact that Mother was institutionalized for these issues further supports a finding that visitation would be a detriment to the children. (Cf. *Ronell A., supra,* at p. 1364.)

Another factor in determining whether denial of visitation would be detrimental is the degree of bonding between the incarcerated or institutionalized parent and the child. (See § 361.5, subd. (e)(1); *Dylan T., supra,* 65 Cal.App.4th at p. 769.) In this case,

neither child had any relationship with Mother by the time of the dispositional hearing. X.L. had been removed from her custody at his birth, and N.L. had been removed from her custody when he was less than two years old. This was not a situation where Mother's relationship with the children would be "subject to erosion" without visitation during the six months between the dispositional hearing and the review date. (See *Dylan T., supra,* at p. 769.) Rather, as the juvenile court implicitly recognized by ordering the social worker to facilitate correspondence between Mother and the children through the children's therapist, any relationship with Mother needed to be reestablished slowly and carefully, because of the children's history of anxiety.

In sum, under the circumstances of this case, substantial evidence supports the juvenile court's denial of Mother's request for visitation pending the results of the psychological evaluations. (See *Dylan T., supra,* 65 Cal.App.4th at p. 775.)

### B. Out-of-County Placement

Mother contends the juvenile court erred by placing the children in a foster home outside the county without following proper procedures. She specifically complains that (1) she did not receive notice of the intended out-of-county placement and (2) the reasons for the out-of-county placement were not documented in the case plan.

There is a preference for foster care placement "in the county of residence of the child's parent or guardian in order to facilitate reunification of the family." (§ 361.2, subd. (g)(1).) However, an out-of-county placement is permissible if "there are no appropriate placements available in the parent's or guardian's county of residence." (*Id.*, subd. (g)(2).) In such a case, the preference is for placement in "a county located adjacent to the parent's or guardian's community of residence" (*ibid*),[5] although this

---

[5] Mother asserts that Kern County is not adjacent to any of the counties in which the parents resided. In fact, Kern County is adjacent to San Luis Obispo County, where Atascadero is located, and the record indicates that Father was still residing there at the time of the children's placement in or around July of 2012.

16

preference does not require "multiple disruptions of the child's placement corresponding to frequent changes of residence by the parent or guardian." (*Id.,* subd. (g)(3).)

There are some procedural requirements for an out-of-county placement. "[T]he specific reason the out-of-county placement is necessary shall be documented in the child's case plan." (§ 361.2, subd. (g)(4).) "[T]he sending county is to maintain responsibility for supervision and visitation of the child" unless there is "a formal agreement between the sending and receiving counties." (*Id.*, subds. (g)(5) &(g)(6).) The social worker is required to "serve[] written notice on the parent or guardian at least 14 days prior to the placement, unless the child's health or well-being is endangered by delaying the action or would be endangered if prior notice were given." (*Id.*, subd. (h).) If notice is given and a parent objects, the court must hold a hearing. (*Ibid.*) "The court shall order out-of-county placement if it finds that the child's particular needs require placement outside the county." (*Ibid.*)

Mother points out that she did not receive notice of the intended out-of-county placement and that the reason for the out-of-county placement is not documented in the case plan. She contends that these procedural errors were prejudicial.

Respondent contends that Mother has forfeited this issue. We agree. Mother failed to object to the out-of-county placement at any of the hearings below. She was represented by counsel at the transfer-in hearing held on September 19, 2012, at the pre-disposition hearings held on October 12, 2012, November 2, 2012, and November 14, 2012. She was personally present and represented by counsel at the December 12, 2012 dispositional hearing. She did not object to the out-of-county placement, or to the procedural defects she now identifies, at any time.

The forfeiture doctrine is intended to encourage parties to alert the trial court to possible errors. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) A party cannot " 'deliberately stand by in silence and thereby permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable.' " (*In re Dakota S.* (2000) 85

17

Cal.App.4th 494, 502.) In this case, mother failed to raise any objection to the out-of-county placement or the Department's noncompliance with the procedures set forth in section 361.2. She thereby forfeited this issue for appeal. (See *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1419.)

### C. *Jurisdictional Findings as to X.L.*

Mother contends one of the allegations concerning X.L. was not supported by substantial evidence: that X.L. was "suffering, or [was] at substantial risk of suffering, serious emotional damage evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others" because he did not have a "parent or guardian capable of providing appropriate care." (See § 300, subd. (c).)

Mother acknowledges that reversal of the section 300, subdivision (c) allegation would not affect the juvenile court's jurisdiction over X.L. under section 300, subdivision (b) [failure to protect]. As she further acknowledges, where there is one valid ground for jurisdiction, appellate courts will often decline to consider whether alternative grounds are supported by the evidence. (See *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence"]; *In re Shelley J.* (1998) 68 Cal.App.4th 322, 330 ["Section 300 contemplates that jurisdiction may be based on any single subdivision."].)

Citing *In re Drake M.* (2012) 211 Cal.App.4th 754 (*Drake M.*), Mother contends we should address her challenge to the section 300, subdivision (c) allegation. In *Drake M.,* the section 300 petition contained allegations as to both the mother and the father. The child was ultimately placed with the father under supervision by the Department of Children and Family Services. (*Drake M., supra,* at pp. 758, 761-762.) When the father appealed, the appellate court reviewed the lower court's findings regarding the father, even though the dependency jurisdiction over minor would remain in place due to its findings about the mother's conduct. The appellate court explained,

18

"the outcome of this appeal is the difference between father's being an 'offending' parent versus a 'non-offending' parent.  Such a distinction may have far reaching implications with respect to future dependency proceedings in this case and father's parental rights." (*Id.* at p. 763.)

Here, unlike in *Drake M.,* neither Mother nor the record suggest any "far reaching implications" of the section 300, subdivision (c) allegations justifying our discretionary review of that issue.  (*Drake M., supra,* 211 Cal.App.4th at p. 763.)  In fact, Mother does not suggest "a single specific legal or practical consequence" of the section 300, subdivision (c) finding.  (See *In re I.A.* (2011) 201 Cal.App.4th 1484, 1493 [declining to exercise discretion to consider alternative jurisdictional finding].)  Moreover, the record does not suggest any such consequence.  For instance, Mother is not presently at risk of having the juvenile court take jurisdiction over another child in the future.  (See *In re D.C.* (2011) 195 Cal.App.4th 1010, 1015 [alternative grounds for jurisdiction considered; mother had another child who was not the subject of the dependency proceedings].)  We therefore decline to address Mother's claim that there was insufficient evidence to find jurisdiction over X.L. under section 300, subdivision (c).

## DISPOSITION

The dispositional order of December 12, 2012 is affirmed.

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

RUSHING, P.J.

_____

ELIA, J.