Filed 4/29/14  In re T.I. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re T.I., A Person Coming Under the Juvenile Court Law. | B249185 |
| _____ | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK96752) |
| Plaintiff and Respondent, | |
| v. | |
| S.L., | |
| Defendant and Appellant. | |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Jacqueline H. Lewis, Judge.  Affirmed.

        Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant.

        Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother S.L. appeals the juvenile court's order asserting jurisdiction over her daughters, T.I. and L.I., and her son, A.I.  The juvenile court sustained allegations that the children's safety was endangered by stepfather P.L.'s sexual abuse of T.I. and mother's failure to protect her from this abuse.[1]  At the time of the jurisdiction hearing, T.I. was 17 years old, L.I. was 16 years old, and A.I. was 13 years old.  Mother contends there was no substantial evidence the children were at risk of serious harm or that mother had failed to protect T.I.  We disagree and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In July 2010, the Department of Children and Family Services (Department) received a referral from an anonymous caller alleging that stepfather had touched T.I.'s breasts while she was asleep.[2]  T.I., who had just turned 15 years old, told the social worker that, while mother was out of town, she and stepfather's biological daughter had gone to the apartment where stepfather was staying, and they had all fallen asleep on the bed while watching television.  T.I. said that stepfather had awakened her by " 'humping her from behind' " and had "fondled her breasts under her night clothes."

When mother returned, T.I. informed her of the incident while stepfather was present.  T.I. said that mother accused her of " 'lying' " and blamed her for the abuse

---

[1]     The children's father resides out of state and is not a subject of this petition.

[2]     There was also a prior referral in 2006 alleging that A.I. had been sexually abused by an unknown perpetrator.  During the course of the Department's investigation, T.I. and L.I. told the social worker that they had previously lived with maternal uncle and he had touched them "on their private parts."  The sexual abuse allegations were found to be substantiated by the Department, however, the case was closed on the grounds that maternal uncle no longer had access to the children.

because mother had told her not to sleep in the same house as stepfather. T.I. further said that mother would not let her attend summer school because she was afraid T.I. would tell her teachers about the abuse.

After the Department intervened, mother and T.I. received counseling, and mother took parenting education and sexual abuse classes. However, the social worker said that mother did not fully participate in services and "appeared to be more concerned about her relationship with the [step]father rather than the well being of the minor T.I." During the course of the case, mother agreed not to allow unmonitored contact between stepfather and T.I. However, after the case closed, she married stepfather, allowed him to move into the family home, and left him alone with the children while she was at work.

In mid-August 2012, stepfather told mother that he had engaged in intercourse with T.I. T.I. was 17 years old at the time. Two weeks later, mother came home from work early and found stepfather having intercourse with T.I. Mother called the police and told the police officer that, after she walked in on stepfather and T.I., she hugged stepfather and asked him if they were going to get divorced. Stepfather said yes, and T.I. said "[w]hy are you hugging him? He doesn't love you." Mother replied "[d]on't steal my husband." The police officer opined that mother appeared to be more concerned about continuing her relationship with stepfather than about her daughter.

The police notified the Department, and a social worker interviewed the family that day. Mother told the social worker that when she had found stepfather having intercourse with T.I., she was concerned he would divorce her and asked him if he

3

intended to do so. Mother further acknowledged that stepfather had admitted to her two weeks prior that he had engaged in intercourse with T.I. Although mother said that she did not believe him at the time, she also said that she "had concerns that something was going on but did not have any 'proof.' "

T.I. said that stepfather had been having sexual intercourse with her for approximately one month, and that the "relationship was 'consensual.' " She also said that she believed mother was jealous of her, and confirmed that mother had not called the police "until after the step-father had decided to file for divorce."

Stepfather told the social worker that he had been in an "ongoing relationship" with T.I. since June 2012 and that he had initiated the "relationship." He said he had engaged in intercourse with T.I. two or three times per week while the other children were sleeping. He also confirmed that he had admitted to mother two weeks prior that he was having intercourse with T.I., and that he "did not know why the mother did not call the police at the time." He denied sexually abusing the other children. He was convicted of sexual abuse of a minor and incarcerated.

On November 13, 2012, mother told the social worker that she had visited stepfather while he was in jail on two occasions, and that stepfather had said he was sorry "that he did not listen to her about the kids." When the social worker asked her what she meant by this, mother said "she had warned [step]father about the children." However, mother now denied that stepfather had ever told her he had engaged in intercourse with T.I.

4

On December 3, 2012, a petition was filed under Welfare and Institutions Code[3] section 300, subdivisions (b),[4] (d)[5] and (j)[6] alleging that the children were at risk due to stepfather's sexual abuse of T.I. and mother's failure to protect her. The juvenile court detained the children but released them to mother's care. The Department was ordered to provide them with family maintenance services.

In the Jurisdiction/Disposition Report dated January 14, 2013, the Department reported that mother said she "plan[ned] on 'trying to work it out' " with stepfather and was "unsure" if they would divorce. At that time, stepfather was still incarcerated. On March 11, 2013, a relative of stepfather said that stepfather was scheduled for deportation.

On April 12, 2013, the court held a jurisdictional and dispositional hearing. With respect to the 2010 incident, mother testified that "it was not proven that anything happened." However, mother also admitted that she had "failed" T.I. by allowing

---

[3] All future statutory references are to the Welfare and Institutions Code.

[4] Section 300, subdivision (b) provides for jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . . "

[5] Section 300, subdivision (d) provides for jurisdiction when the child has been sexually abused, there is a substantial risk that the child will be sexually abused by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse.

[6] Section 300, subdivision (j) provides for jurisdiction when "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

stepfather back in the house after the 2010 abuse.  With respect to the 2012 incident, mother claimed that stepfather had not told her prior to the incident that he had engaged in intercourse with T.I. Mother said that, on the night of the incident, she had "just" had a "motherly instinct . . . that something [wa]s not right."  She also said that when she discovered stepfather and T.I. having intercourse, she had cursed at stepfather and immediately called the police.  When asked what her current feelings towards stepfather were, she said "[g]et out of my life."

T.I. also testified at trial.  She denied that stepfather had molested her in 2010, but also said that she felt the incident was her "fault for even going inside the room." She said that after the 2010 case was closed and before the 2012 incident, mother "constantly asked" about her "relationship with [stepfather]," and that T.I. repeatedly told her that "nothing happened" and "everything was fine."  T.I. explained that she was worried the truth would "ruin [the] family" and would cause her to "get in trouble."  She further said that, after the 2012  incident, mother "never blamed" T.I., although T.I. herself felt that everything was her own "fault."

The juvenile court sustained the petition, stating that "I frankly did not find mother's testimony that, while at work one night, she simply had a, quote, 'motherly instinct,' that something was happening with her child and went home -- didn't find it to be believable.  I find that mother's consistent and constant questions to T.I. about what was going on with [stepfather] was indicative of the fact that mother knew what was going on with [him]."  The court also made a finding that father was "in jail" and was "going to be deported."  The court ordered the children to remain in mother's custody

under the Department's supervision with family maintenance services. Mother appealed.[7]

***CONTENTIONS***

Mother contends that there was no substantial evidence supporting the juvenile court's finding that the children were at risk of serious harm at the time of the jurisdiction hearing because stepfather had been deported and she had no intention of reuniting with him. Mother also contends the juvenile court erred in sustaining the allegations as to her because the evidence established she had made extensive efforts to protect T.I.

***DISCUSSION***

1. *Standard of Review*

We review the juvenile court's jurisdictional findings under the substantial evidence test. (*In re Maria R.* (2010) 185 Cal.App.4th 48, 57, disapproved on another ground in *In re I.J.* (2013) 55 Cal.4th 766, 780-781.) "The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) In determining whether there is substantial evidence, "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

---

[7]     The juvenile court has since terminated its jurisdiction over the children.

2.      *The Appeal Is Not Moot*

The Department argues that the appeal is moot because the juvenile court has since terminated jurisdiction over the children.  The Department is correct that an order terminating the juvenile court's jurisdiction may render the appeal of a previous order moot.  (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.)  However, we may also exercise our discretion to reach the merits of a challenge to any jurisdictional finding when the finding may be prejudicial to the appellant.  (*Ibid.*)  Here, the finding that mother failed to protect her daughter from sexual abuse and placed her other children at risk of harm has the potential to impact future dependency proceedings.  (*In re D.C.* (2011) 195 Cal.App.4th 1010, 1015.)

3.      *A Current Risk of Serious Harm*

Mother contends that there was no substantial evidence there was a current risk of harm to the children at the time of the jurisdiction hearing because father had been deported and mother "had no intention of ever reuniting with [him]."  The juvenile court found that T.I., L.I. and A.I. were persons described under section 300, subdivisions (b), (d) and (j).  Both subdivisions (b) and (j) provide for jurisdiction when the child or sibling has been abused or neglected *and* there is a current risk of abuse.[8]  However, there is no provision in subdivision (d) limiting the duration of dependency to the time

---

[8]      Subdivision (b) provides that "[t]he child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness."  (§ 300, subd. (b).)  Likewise, for subdivision (j) to apply, there must be "a substantial risk that the child *will be* abused or neglected."  (§ 300, subd. (j), italics added.)

frame when the child remains at risk of sexual abuse.[9] (*In re Carlos T.* (2009) 174 Cal.App.4th 795, 803.) Accordingly, jurisdiction was proper under subdivision (d).

Furthermore, the juvenile court also properly made a finding of current risk to the children under subdivisions (b) and (j). Mother argues first that there was no current risk to the children because stepfather was deported at the time of the jurisdiction hearing.[10] However, the record does not show that stepfather was deported. The record indicates only that a relative said that stepfather was "scheduled" for deportation, and that the juvenile court found that he was "going to be deported." There is no additional evidence confirming that stepfather was actually deported.

Furthermore, although mother testified at trial that she no longer wanted to remain in contact with stepfather, there was substantial evidence to the contrary. At trial, mother contradicted statements she had previously made to the police and the Department. Mother initially told the police and a social worker that, when she discovered stepfather having intercourse with T.I., she asked stepfather if he was going

---

[9]     Subdivision (d) provides in its entirety that jurisdiction is proper when "[t]he child has been sexually abused, *or* there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse." (§ 300, subd. (d), italics added.)

[10]     Mother also argues that, at the time of the jurisdiction hearing, T.I. was only a month away from turning 18 years old. The suggestion appears to be that a month is a negligible amount of time in which to protect a minor. We disagree. The juvenile court had the duty to ensure T.I.'s protection during that month and the court was also authorized to continue to provide services to her until her 21st birthday. (§ 303, subd. (a).)

9

to divorce her. At trial, she testified that, in fact, she had cursed stepfather and then immediately called the police.

Mother also initially told a social worker that stepfather had admitted, two weeks prior to the 2012 incident, that he had engaged in intercourse with T.I. At trial, mother denied that stepfather had ever told her this. Mother also said, only three months prior to trial, that she was still " 'trying to work it out' " with stepfather and was "unsure" if they would divorce. Accordingly, it was reasonable for the juvenile court to disregard mother's testimony at trial that she no longer wished to reunite with stepfather, and to therefore find that there was a current risk that mother would not protect the children from further contact with him.[11]

4.      *Mother's Failure to Protect the Children*

Mother contends that there was no substantial evidence supporting the juvenile court's finding that mother had failed to protect T.I. because mother had "unceasingly made efforts to discover whether [stepfather] was abusing her daughter" and had "immediately called the police" when she "discovered the truth."[12] Mother selectively represents the record in her favor. When reviewing a juvenile court's jurisdiction

---

[11]      Mother also points out that neither L.I. nor A.I. was abused by stepfather. Mother appears to suggest that the lack of prior abuse shows that these children were not at risk of sexual abuse by stepfather. However, both L.I. and A.I. were close to the age when stepfather started sexually abusing T.I., and a father's severe sexual abuse of one child may be sufficient to support dependency jurisdiction over all siblings regardless of gender. (*In re I.J.* (2013) 56 Cal.4th 766.)

[12]      Mother also contends that the juvenile court erred in finding that she had failed to protect L.I. and A.I., however, no such finding was made. The juvenile court only made the finding that mother's failure to protect *T.I.* placed L.I. and A.I. "at risk of" harm.

10

findings for substantial evidence, we must "draw all reasonable inferences from the evidence to support the findings and orders of the dependency court." (*In re Heather A., supra,* 52 Cal.App.4th at p. 193.) Under this lens, there is abundant evidence supporting the juvenile court's finding that mother knew that T.I. was being sexually abused by stepfather, and still allowed stepfather to have unlimited access to the children.

When T.I. told mother about the 2010 incident, mother accused T.I. of lying, but also said the abuse was T.I.'s fault for having slept in the same house as stepfather. Even after mother participated in a sexual abuse class and counseling to address this abuse, mother still allowed stepfather to move into the home and left him alone with her children while she was at work. Mother then told a social worker that stepfather had admitted he had engaged in intercourse with T.I. two weeks prior to the 2012 incident, and yet, mother had not take any action to protect T.I. In addition, when mother actually witnessed the sexual abuse, she did not act surprised or concerned about her daughter's welfare, but asked stepfather if he was going to divorce her and accused T.I. of "steal[ing]" her husband. These are just a few of the many facts in this record showing mother's knowledge of the abuse and her failure to protect T.I. Accordingly, there was substantial evidence supporting the juvenile court's decision to sustain the allegations against mother.

*DISPOSITION*

The judgment is affirmed.


*NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*



KITCHING, J.


WE CONCUR:



KLEIN, P. J.



ALDRICH, J.

12