Filed 1/28/16  In re J.R. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | B264322<br><br>(Los Angeles County<br>Super. Ct. No. DK01786) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>F.M.,<br><br>        Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Marguerite Downing, Judge.  Reversed in part and affirmed in part.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kim Nemoy, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

F.M. (father) appeals from jurisdictional and disposition orders made pursuant to Welfare and Institutions Code[1] section 300 declining to place his infant son, J.R., in his custody after J.R. was removed from the child's mother, Na. R. (mother). Father claims there is insufficient evidence to support the finding that his drug use posed a risk to J.R., and thus that the court erred in sustaining the jurisdictional allegations against him and in refusing father's request to place J.R. in his care. We agree and reverse.

## FACTS AND PROCEDURAL BACKGROUND

### A. Initial Detention and Section 300 Petition

J.R. is the youngest of mother's six children. Mother's five older children, No.R. (born 2007), A.R. (born 2010), twins I.R. and Ja. R. (born 2012), and E.R. (born 2013),[2] are dependents of the court and are receiving permanent placement services due to the drug abuse and history of violent altercations by mother and N.R. (their father). In September 2014, the dependency court terminated reunification services for J.R.'s five half-siblings for both mother and N.R.

J.R. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) at the time of his birth in October 2014, when DCFS received a report that he was born prematurely at 32 weeks gestational age, that mother had no prenatal care, and that mother had tested positive for methamphetamine several days prior to his birth. According to the detention report, mother admitted using methamphetamines "a handful" of times during her pregnancy and had received no prenatal care. She also stated that she and N.R. were currently homeless. Both mother and J.R. tested positive for methamphetamine at the time of J.R.'s birth.

---

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Only J.R. is the subject of this appeal. Mother's husband, N.R., is the father of J.R.'s half-siblings. Neither mother nor N.R. are parties to this appeal. We therefore provide only brief background as to the allegations and findings concerning mother, N.R., and the other children.

On November 3, 2014, DCFS filed a petition under section 300, subdivision (b), alleging (in count b-1) that mother's "15 year history of illicit drug use" and current use of methamphetamines and marijuana, including during her pregnancy with J.R., rendered her incapable of providing for J.R.'s care and supervision, endangered J.R.'s health and safety and placed J.R. at risk of physical harm. The petition further included similar allegations (in count b-2) against N.R., whom mother had identified as J.R.'s biological father.

At the detention hearing, the court found a prima facie case for detaining J.R. pursuant to section 300, subdivision (b).

## B. Adjudication

In the jurisdiction/disposition report filed on November 25, 2014, DCFS reported that J.R. remained hospitalized following his premature birth.[3] In an interview with a case social worker (CSW) on November 12, 2014, mother stated that N.R. might not be J.R.'s biological father. Mother revealed she was having an "intimate relationship with [father] during the time the child was conceived." Father was interviewed on November 13, 2014; he confirmed his relationship with mother but stated he was "not sure if he is the father." Father indicated he would attend the next dependency hearing and would request a DNA test to establish paternity. The jurisdiction/disposition report stated that father had "an extensive" criminal history "related to misdemeanor traffic violations." According to the attached criminal history report, father was arrested several times between 2007 and 2010 for driving with a suspended license.

At father's request, the court ordered a DNA test to establish paternity for J.R. on November 25, 2014. DCFS filed a last minute information on January 21, 2015, reporting that the DNA test results indicated a 99.99% probability that father was J.R.'s biological father. DCFS also interviewed father on January 21, 2015. He stated that he was "willing to take responsibility" for J.R. and would seek custody of the child. Father denied any knowledge of mother's history with drugs, stating that he had met mother in

---

[3] J.R. was discharged shortly thereafter and placed with a family friend, who was also caring for three of his older half-siblings.

December 2013 and "went out with her a few times," but was never in a serious relationship with mother and had no current relationship with her. Other than the traffic violations, father had no criminal history.

Father reported that he was living with his mother, L.M. (grandmother), who had agreed to help take care of J.R. Grandmother had no criminal history. Father stated he works a graveyard shift of about 32 hours per week at Walmart. He was "in the process of purchasing" necessary items for J.R., including a car seat, clothing, and diapers, and already had secured a crib. DCFS noted that father "appeared to be overwhelmed with the paternity findings but he also appeared to be very motivated to gain custody of the child." DCFS deferred any recommendations as to father, but advised that any release of J.R. be done "in a slow transition to allow the child and father to bond."

Father denied any substance abuse and agreed to submit to testing on demand. A test performed on January 21, 2015 showed positive results for methamphetamine for father. As a result, DCFS recommended that J.R. not be released to father.

At the adjudication on January 23, 2015, the court found father to be the biological father of J.R. and ordered monitored visitation and weekly random drug testing, both at father's request. The court continued the remainder of the hearing pending receipt of a supplemental report by DCFS.

DCFS filed a first amended section 300 petition on February 11, 2015, adding allegations against father. Count b-3 alleged that father's "11 year history of illicit drug use," and current use of methamphetamines, rendered him incapable of providing care and supervision for J.R. and placed J.R. at risk of physical harm.

In its interim review report, DCFS detailed further interviews with father and grandmother conducted on January 26, 2015. Father stated he did not have "a drug addiction" but would rarely use methamphetamines "on the weekend'" or "at part[ies] when I'm hanging out with somebody." He stated that he first used methamphetamines when he was 21 years old, "then I stopped. I used a couple of times here and there but I am not an addict. There were times I didn't use for years." He denied using

4

methamphetamines with mother and stated he "did not know she was using." He told DCFS that he would "drug test everyday if I need to."

Grandmother reported that she had never met mother and did not believe father had a drug problem. She stated "'I just see him drink 1 to 2 beers once in a while. He has no issues with beer or drugs.'"

DCFS reported father was attending his monitored weekly visits with J.R. and participating in the child's physical therapy sessions. According to the monitor, the visits were going well and father was learning how to care for J.R. Grandmother also was attending the visits and "assisting in guiding the father" in caring for J.R.

DCFS confirmed that father enrolled in a ten-week parenting program beginning February 26, 2015. He also was participating in weekly random drug testing. In addition to his positive test on January 21, father also tested positive for methamphetamines on February 5, 2015.[4]

DCFS noted that father "has not been forthcoming . . . in regards to his drug abuse," citing father's denial of any drug issues and two positive tests. Father reported that J.R. was his first child, and DCFS noted that during visits it was "evident that [father] requires guidance when he is changing, feeding and holding the baby." DCFS concluded that "[a]t this time it is not in the best interest of the child to be returned to the parent's care."

In a last minute information filed March 10, 2015, DCFS reported that father's visits with J.R. were put on hold when the child was hospitalized with a respiratory virus on February 18, 2015. Father's visits resumed on March 13, 2015.

DCFS also reported that father had enrolled in a six-month outpatient drug treatment program on February 23, 2015, meeting three times per week. He also continued to participate in weekly drug testing. Father had one additional positive drug

---

[4] Father missed a test on February 4, 2015. He claimed he did not discover he was scheduled to test until that afternoon, and left a message with the testing center on the evening of February 4, 2015 to that effect.

test for methamphetamines on February 13, 2015 and then three subsequent negative tests on February 20, February 27, and March 4, 2015.

At the continued adjudication hearing on March 12, 2015, the court sustained count b-1 as to mother and dismissed count b-2 as to N.R. Counsel for J.R. argued that the court should sustain count b-3 regarding father, noting that in light of his recent positive drug test, she found it "hard to believe that this . . . does not amount to a real problem of substance abuse." Although she acknowledged that J.R. was not in father's care at the time of the positive tests, she argued that there was a risk to the child based on J.R.'s young age and father's history of drug use that "does seem, at this point, to be unresolved." Counsel for DCFS agreed, arguing that father's second positive drug test on February 13 indicated "renewed use" during a period in which father knew he would be tested and therefore showed that father "can't stop using." She also noted that he fathered a child with mother, "someone who has an extremely long history of heavy drug use." Father's counsel argued there was no "nexus between father's methamphetamine use and any current risk to his son." She also pointed out that father had stopped using drugs since learning he was J.R.'s father, as evidenced by his recent negative test results, and that there was no evidence that father's drug use ever rose to the level of abuse or rendered him incapable to adequately care for his child.

The court sustained the allegations regarding father, noting that father had a "longstanding history" of drug use and knew, at the time of the February 13 test, that "there was a possibility" he had a child. The court further relied on the young age of the child as well as the "company that [father] keeps with respect to the mother." Based on father's request that J.R. be placed with him on a home of parent order, the court continued the matter for disposition, and ordered "a supplemental report to address additional drug tests."

## C. Disposition

In a last minute information filed in advance of the disposition hearing, DCFS detailed the home assessment it conducted on March 18, 2015 at the one-bedroom apartment shared by father and grandmother. DCFS noted child safety latches were

6

needed on some cabinets and father agreed to purchase and install them. Father had a crib set up in the bedroom and stated he had set aside two drawers for J.R.'s belongings and was in the process of purchasing "clothing, linens, blankets etc." for the child. DCFS also approved grandmother as a monitor for father's visits with J.R.

Father reported that he had missed one of his drug treatment classes because he overslept. He stated that his sleep schedule was "off due to his classes that he is taking, visitation and work," but that he was "doing his best to remain on track." Father had three additional drug test results, all negative, on March 10, 18, and 25, 2015. Father missed a test on March 12, 2015. Father was attending the adjudication hearing in this matter on that date and stated he could not make the test after leaving court.

The disposition hearing took place on April 3, 2015. J.R.'s counsel opposed his placement with father "at this time." Based on the youth of the child, father's "11-year history of methamphetamine," his positive drug tests, and that he had "not been consistent in his program requirement," she argued that placement with father "would be premature." Counsel for DCFS agreed, arguing that father had "no acknowledgement of his seriousness of his drug addiction problem."

Father's counsel contended that DCFS had not met its burden to establish that placement of J.R. with father would be detrimental to the child's safety. She noted that the court could "put services into place" that would ensure J.R.'s safety in father's home, including continued random drug testing, completion of classes, and unannounced home visits. She noted that father had appropriate housing and "is continuing to test clean."

The court found that "there is a substantial danger if this child were returned home to his physical health, safety, protection, physical and emotional well being," and that "there are no reasonable means by which he may be protected without removing him from his parents' physical custody." The court noted father's positive drug tests in January and February and concluded that, "[t]his is a brand new baby and [father] has got an 11 year history. He can't -- I need a longer period of clean drug tests before I'm comfortable to make it an unmonitored visitation or to make it a home of parent/father order." The court therefore removed J.R. from the custody of both mother and father and

7

ordered family reunification services and continued monitored visitation to father.[5] Further, in addition to random drug testing and parenting classes, the court ordered "individual counseling to address case issues pursuant to" section 361.5, subdivisions (b)(10) and (b)(13), noting "this is minor number six."[6]

Father filed a timely notice of appeal.

## DISCUSSION

### A. Justiciability

DCFS asserts that we need not reach father's jurisdictional challenge, as the dependency court will maintain jurisdiction over J.R. regardless of the outcome of this appeal based on the unchallenged findings regarding mother. "[A] jurisdictional finding good against one parent is good against both" because dependency jurisdiction attaches to the child, not the parents. (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) Thus, the general rule is that a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction and render moot a challenge to the other findings. (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

However, we generally will exercise our discretion to reach the merits of a challenge to a jurisdictional finding where the finding "(1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction'

---

[5] The court made joint findings under section 361, subdivision (c), as to both mother and father. As discussed below, this was error, as that section applies only to custodial parents.

[6] We note that these findings also were in error as to father. DCFS requested, and the court granted, denial of reunification services to mother based on section 361.5, subdivisions (b)(10) and (b)(13), which involve, respectively, findings that the parent failed to reunify with a sibling of the child and that the parent "has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment." Neither of these sections applied to father, as J.R. was his first child and he had no history of prior court-ordered treatment.

[Citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763 (*Drake M.*); see also *In re D.C.* (2011) 195 Cal.App.4th 1010, 1015; *In re Anthony G.* (2011) 194 Cal.App.4th 1060, 1064-1065.) Here, the jurisdictional findings related to father's drug use serve as the basis for the dispositional order denying his request for custody of J.R. Moreover, as in *Drake M.*, "the outcome of this appeal is the difference between father's being an 'offending' parent versus a 'non-offending' parent. Such a distinction may have far reaching implications with respect to future dependency proceedings in this case and father's parental rights." (*Drake M., supra*, 211 Cal.App.4th at p. 763.) We accordingly exercise our discretion in favor of considering father's claims on the merits.

**B.  The Court's Jurisdictional Finding As to Father Lacks Substantial Evidence**

Father contends substantial evidence did not support the dependency court's conclusion that J.R. was at substantial risk of harm from his drug history or current use. We agree.

We review the juvenile court's jurisdictional findings and order for substantial evidence. (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 966; *In re R.C.* (2012) 210 Cal.App.4th 930, 940.) Under this standard, "[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible." (*In re David M.* (2005) 134 Cal.App.4th 822, 828.)

Section 300, subdivision (b) permits the assertion of jurisdiction where "the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his parent . . . to adequately supervise or protect the child . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse." Where the child has not suffered actual harm, the evidence must establish "'that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm. . . .' [Citation.]" (*In re A.G.* (2013) 220 Cal.App.4th 675, 683.)

9

It is well-settled that absent evidence that drug use has caused a child serious physical harm or illness or put the child at substantial risk of incurring such harm, mere use of illicit drugs by a parent constitutes an insufficient basis to support jurisdiction under subdivision (b) of section 300. (*Drake M., supra*, 211 Cal.App.4th at p. 769; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003 ["It is undisputed that a parent's use of marijuana[, hard drugs, or alcohol] 'without more,' does not bring a minor within the jurisdiction of the dependency court."].)

In *Drake M.*, the court of appeal reversed a jurisdictional finding based on a father's use of medical marijuana. (*Drake M., supra*, 211 Cal.App.4th at pp. 757–758.) The court first distinguished between substance "use" and substance "abuse," noting that "jurisdiction based on 'the inability of the parent or guardian to provide regular care for the child due to the parent's . . . substance abuse,' must necessarily include a finding that the parent at issue is a substance *abuser*. (§ 300, subd. (b).)" (*Id.* at p. 764.) Such a finding of substance abuse, the court concluded, must be based on either (1) a diagnosis by a medical professional of a "current substance abuse problem"; or (2) evidence sufficient to establish a "current substance abuse problem" as defined in The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th rev. ed. 2000) (DSM–IV–TR). (*Id.* at p. 766.) Under the latter definition, substance abuse is based on "clinically significant impairment," as manifested by "'failure to fulfill major role obligations at work, school, or home,'" "'recurrent substance use in situations in which it is physically hazardous (e.g. driving an automobile . . . when impaired)'"; "'recurrent substance-related legal problems'"; or "'continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance.'" (*Ibid.*) In other words, as one court concisely put it, "a finding that a parent has a substance abuse problem justifying the intervention of the dependency court" is supported by "a medical diagnosis of substance abuse" or "evidence of life-impacting effects of drug use." (*In re Rebecca C.* (2014) 228 Cal.App.4th 720, 726.)

10

Recently, Division Seven of this district rejected the conclusion that "only someone who has been diagnosed by a medical professional or who falls within one of the specific DSM–IV–TR categories can be found to be a current substance abuser." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1218 (*Christopher R.*).) The court held that the mother's use of cocaine "while in the final stage of her pregnancy, combined with her admitted use of the drug in the past and her failure to consistently test or enroll in a drug abuse program, justified the juvenile court's exercise of dependency jurisdiction over her children," without regard to whether she fell within a specific DSM–IV–TR category or had been diagnosed as a substance abuser by a medical professional. (*Id.* at pp. 1218–1219 [noting that "the *Drake M.* formulation . . . is not a comprehensive, exclusive definition mandated by either the Legislature or the Supreme Court[.]"].) However, regardless of whether *Drake M.* is viewed strictly or merely "as a generally useful and workable definition of substance abuse for purposes of section 300, subdivision (b)" (*id.* at p. 1218), the court must nevertheless base its assertion of jurisdiction on a finding of substance abuse, rather than mere use.

Here, the parties agree that father was never subject to a clinical evaluation or professional diagnosis of substance abuse. Moreover, there is no evidence that father suffered from substance-abuse related impairment sufficient to meet any of the other *Drake M.* factors—he maintained steady employment and stable housing, had no prior criminal history or legal problems related to drug use, and demonstrated no "persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance." (*Drake M., supra*, 211 Cal.App.4th at p. 766.) Indeed, there is no evidence that father had used methamphetamine in J.R.'s presence or at a time or in a manner that would be likely to render him incapable to care for the child or put the child at substantial risk of harm.

Instead, DCFS and the court relied solely on father's three positive drug tests, as well as his reported intermittent history of drug use and denial of a drug abuse problem, to conclude that father would be unable to properly care for J.R. But in light of father's consistently clean test results within a month of learning he had a child, his request for

11

and cooperation with random drug testing, and the absence of any other indications of "life-impacting effects of drug use," we conclude that there was insufficient evidence to establish that father's drug use rose to the level of abuse for the purposes of sustaining the allegations in count b-3. (See *Drake, supra*, 211 Cal.App.4th at pp. 768-769 [no jurisdiction based on father's drug use where evidence showed child was "healthy, that there was family support and that father was employed," there was no evidence of abuse, and "no evidence showing that Drake was exposed to marijuana, drug paraphernalia or even secondhand marijuana smoke]; *In re Rebecca C., supra,* 228 Cal.App.4th at p. 727 [no evidence that mother's methamphetamine abuse caused a substantial risk of harm to teenaged child]; see also *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1346-1347[finding mother's "missed, diluted, and positive drug tests between the 12–month review report/hearing and the 18–month review report/hearing" did not support a finding of a substantial risk to the children's well-being, where mother was employed, cooperative, and there was no evidence "linking Mother's marijuana and alcohol use to her parenting judgment or skills"].)

The court also relied on J.R.'s very young age in support of its assertion of jurisdiction. Assertion of jurisdiction is warranted where the child is "of such tender years that the absence of adequate supervision and care poses an inherent risk to [his or her] physical health and safety." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.) Moreover, for such a child, "'the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of harm.'" (*Christopher R., supra*, 225 Cal.App.4th at p. 1219; see also *Drake, supra*, 211 Cal.App.4th at p. 767.) Here, as discussed above, there was insufficient evidence to establish a finding of substance abuse by father. As such, the fact of J.R.'s young age must be coupled with some other evidence showing that father would be unwilling or unable to adequately supervise and care for his son. There is no such evidence in this record. To the contrary, father appeared at all times to be willing to take on the responsibility of caring for his young child. Upon learning of his paternity, he immediately began preparing his home to accept an infant, began to regularly attend

12

parenting and drug treatment classes, and agreed to submit to weekly random drug testing, all while maintaining his nighttime employment. He also attended weekly visits and physical therapy with J.R. and had the additional family support of grandmother, who lived with father and was ultimately approved as a monitor by DCFS. Under these circumstances, we conclude that the dependency court's finding of jurisdiction under section 300, subdivision (b) is not supported by substantial evidence.

## C. The Court's Disposition Orders Similarly Constitute An Abuse of Discretion

In light of our conclusion that there was insufficient evidence to establish that father's drug use created a risk of harm to J.R. as a basis for jurisdiction, it follows that the court's disposition order as to father must be reversed as well. Indeed, father's argument as to disposition is stronger, given his continued period of clean testing between the adjudication and disposition hearings, and the heightened burden of proof at disposition. (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1401 [discussing "clear and convincing evidence standard" at disposition]; *In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 [the clear and convincing standard "is a heightened standard of proof from the required preponderance of evidence standard for taking jurisdiction over a child"].)

We note that the dependency court made its disposition findings as to both mother and father based on section 361, subdivision (c) that "there is a substantial danger if this child were returned home to his physical health, safety, protection, physical and emotional well being," and that "there are no reasonable means by which he may be protected without removing him from his parents' physical custody." However, that section applies only to removing a child "from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated." (§ 361, subd. (c).) It was therefore inapplicable to father, a noncustodial parent. The applicable statute, section 361.2, subdivision (a) provides that, upon removal from a custodial parent, the court shall determine whether there is a noncustodial parent "who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." Given the similarity

13

of the standards, the application of section 361, subdivision (c), rather than 361.2, subdivision (a) was harmless error.  (*In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303.)

In any event, under either standard, the court lacked clear and convincing evidence to conclude that placing J.R. with father would be detrimental to the child.  "A parent's right to care, custody and management of a child is a fundamental liberty interest protected by the federal Constitution that will not be disturbed except in extreme cases where a parent acts in a manner incompatible with parenthood."  (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1828; see also *In re Isayah C.* (2004) 118 Cal.App.4th 684, 697 ["a nonoffending parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so, in the absence of clear and convincing evidence that the parent's choices will be 'detrimental to the safety, protection, or physical or emotional well-being of the child'"].)  The juvenile court therefore erred in denying father's request for custody of J.R.

## DISPOSITION

The judgment is reversed in part as to the jurisdictional finding that pertains to F.M.'s conduct (count b-3) and the disposition as to F.M.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

14